(106 So. 724)

. No. 25437.

## C. C. MENGEL & BRO. CO. v. LIBERTY OIL CO., Limited.

(Nov. 30, 1925. Rehearing Denied Jan. 4, 1926.)

*(Syllabus by Editorial Staff.)*

1. **Evidence** ⊖⟩155(8)—**Letter referred to in purported contract, and others in turn referred to, admissible to explain contract.**

Where letter purporting to be contract referred to a previous letter, which in turn referred to another all letters referred to are admissible to explain contract.

2. **Sales** ⊖⟩87(3)—**Evidence held to show that contract covered fuel requirements, at two ports.**

Evidence *held* to show that contract to purchase all bunker fuel oil needed by plaintiff's ships for one year covered requirements at Pensacola as well as at New Orleans, in that oil to be delivered f. o, b. New Orleans tank cars was intended to be forwarded to Pensacola, and hence purchase by plaintiff of fuel at latter port from another company constituted a breach of contract.

Appeal from Civil District Court, Parish of Orleans; Percy Saint, Judge.

Action by the C. C. Mengel & Bro. Company against the Liberty Oil Company, Limited. Judgment for defendant, and plaintiff appeals. Affirmed.

W. Catesby Jones, of New Orleans, for appellant.

McCloskey & Benedict, of New Orleans, for appellee.

ST. PAUL, J. On January 27, 1920, the steamship Oregon, belonging, or under general charter, to the plaintiff, purchased 711 barrels of bunker oil, for which plaintiff paid $1.75 per barrel. On March 3d and 6th she purchased 1,308 barrels, for which plaintiff paid $2.75 per barrel.

This is a suit to recover from defendant 60 cents per barrel on the 711 barrels and $1.60 per barrel on the 1,308 barrels; being the difference between the price paid and $1.15 per barrel, at which defendant engaged to deliver bunker oil to said steamship for one year beginning August 23, 1919, but which defendant refused to furnish at that price.

The defense is that plaintiff first breached the contract (actively) by purchasing bunker oil for said steamship at Pensacola, Fla., from others than defendant, as to which, "it is admitted * * * that on or about September 25, 1919, plaintiff purchased for the steamship Oregon, from the Texas Oil Company in Pensacola, Fla., 249 barrels of (bun-

ker) oil at $1.21 per barrel (said steamship being then at Pensacola)."

And the sole question involved is whether or not said contract (by which defendant engaged to furnish, and consequently plaintiff engaged to take, the entire supply of bunker fuel oil needed by said steamship during said time) covered requirements at Pensacola as well as at New Orleans.

### I.

The contract consists of a letter from defendant, dated August 23, 1919, addressed to plaintiff, and reading as follows:

"Referring to your letter of July 7th, with reference to contract covering period of one year on your fuel oil requirements for the steamers Oregon and Hornet:

"We hereby agree to furnish these steamers with their requirements of Liberty Native 26/28 gravity fuel oil for a period of one year from date, at a price of $1.15 per barrel of 42 gallons on all oil delivered to vessels from our station at Chalmette (just below New Orleans), and at a price of $1.00 per barrel f. o. b. New Orleans on any oil shipped to Pensacola, Fla.

"We further agree to supply any other oil-burning vessel which you may have under charter during the life of this contract with fuel oil on the same basis as the steamships Hornet and Oregon.

"If the above meets with your approval, please write your acceptance on duplicate inclosed herewith, to stand in lieu of formal contract, and return for our files."

The duplicate so inclosed, with an acceptance thereon as follows: "Accepted this ———— day of August, 1919. [Signed] C. C. Mengel & Bro. Company, per S. L. Frazer, Traffic Manager"—was duly returned in a letter from plaintiff, dated August 28th, and reading as follows: "We are inclosing herewith signed copy of contract covering fuel oil requirements at New Orleans, La."

### II.

[1] On its face *the contract* appears to cover all fuel oil requirements of said steamship, whether at Pensacola or at New Orleans, but, in view of the reference to prior correspondence in the very letter in which the contract itself is embodied, it is contended by plaintiff that the prior correspondence is admissible to explain the contract, and that from that correspondence it appears that the contract was intended to cover requirements for fuel oil only at New Orleans and not elsewhere.

In Wigmore on Evidence, § 2104, it is said:

"Where a writing offered refers to another writing, the latter should also be put in at the same time, provided the reference is such as to make it probable that the latter is requisite to a full understanding of the effect of the former."

In Williston on Contracts, vol. 11, p. 1211, it is said:

"Where a writing refers to another document, the latter, or so much thereof as is referred to in it, is to be construed as part of the writing."

In 22 Corpus Juris, 1183 (verbo, "Evidence," § 1583), it is said:

"Other writings relating to the same subject-matter are, especially if expressly referred to, admissible in evidence to explain the agreement before the court."

We are therefore of opinion that plaintiff's letter of July 7th, referred to in the contract itself, as it were, is admissible. And since that letter in turn refers to another, and this latter to a third, we give here these three letters, as follows.

### III.

[2] On June 30, 1919, plaintiff wrote defendant as follows:

"We understand you had a talk with our Mr. Kornfield while he was in New Orleans, relative to a time contract on fuel oil requirements, and we would be glad to know if you are now in position to arrange for such contract.

"We are now operating the oil-burning steamers Oregon and Hornet, both of which are in the Nicaraguan-Gulf log trade. During the next year some of our return log cargoes will probably come to Pensacola, and there may be one or two to go to New York, and as a result we could not bind ourselves in a contract whereby we would have to take at New Orleans

any certain amount of oil per month as a minimum. The maximum, of course, would not run over 1,500 barrels.

"If you draw up a contract for our oil requirements on fuel oil of 26/28 gravity, delivery at New Orleans, f. o. b. vessel or f. o. b. tank cars, our option, at $1.00 per barrel, we will be glad to consider entering such an agreement. Of course it would be understood, however, that when our vessels are in any other port outside of New Orleans we reserve the privilege of purchasing on the open market."

On July 2d defendant answered plaintiff as follows:

"We are in receipt of yours of the 30th ultimo, and note what you say about contract covering period of one year on your requirements for 26/28 gravity Liberty Native Fuel oil, and it will be impossible for us to send you a contract at $1.00 per barrel, your option, f. o. b. vessel or tank cars, as it costs us, as explained in our previous letter, 15 cents per barrel to put oil through our terminals at Chalmette; but we are perfectly willing to make your contract for your requirements on 26/28 gravity Liberty Native fuel oil for a period of one year, at $1.15 per barrel on all oil that is going to be taken by your vessels, the steamers Oregon and Hornet, at Chalmette; and on any oil shipped to Pensacola the price will be $1.00 per barrel f. o. b. New Orleans; and we would not require you to accept a minimum or maximum amount, as you would have the privilege of purchasing on the open market, provided your steamers do not come to New Orleans.

"If this meets with your approval, kindly advise, as it will give us great pleasure to accept contract as above mentioned."

On July 7th plaintiff wrote defendant as follows:

"We beg to acknowledge your letter of July 2d with reference to contract covering period of one year on our fuel oil requirements for the steamers Oregon and Hornet. We will be glad for you to forward us signed contract along the terms of your letter, but we would like to be protected in the event of any decline in the price of fuel oil. Can you not arrange to protect us in the event of a fall in the market?

"We also would like you to insert a clause in the contract whereby we may obtain fuel oil for any other oil-burning vessels we may have under charter within the period of one year."

Thereupon, to wit, on July 11th, defendant wrote plaintiff a letter which is *word for word* the same as that of August 23d, hereinabove first quoted, as constituting the contract between the parties, *except* that the words "26/28 gravity" do not appear therein between the words "Liberty Native" and the words "fuel oil," as they do in the letter of August 23d.

On August 1st plaintiff called defendant's attention to this omission, and asked to be furnished with a new contract with that stipulation inserted.

On August 6th defendant replied, asking for the return of the signed original (proposed) contract, "which we will be glad to amend as per your letter."

On August 8th plaintiff returned "the proposed contract on fuel oil to take care of our requirements at New Orleans," asking for its amendment and return.

On August 23d defendant returned the contract as requested, "which we have amended, and which we trust will now meet with your views."

The contract, as amended, and the acceptance thereof, are given in paragraph I, above.

**IV.**

From plaintiffs' letter of June 30th it will appear that although some of its return cargoes might come to Pensacola and perhaps to New York, and plaintiff would therefore not bind itself for any certain amount at New Orleans, but would reserve the right to purchase in the open market when its vessels were at any other port than New Orleans, *nevertheless* plaintiff did seek a contract for the oil requirements of its vessels at a flat rate of $1 per barrel *"delivery at New Orleans, f. o. b. vessel or f. o. b. tank cars, our option."*

Now it is perfectly clear that no man would seriously stipulate for fuel for his vessels at any given port at the same flat

rate per barrel whether actually stored in her bunkers or only laid down alongside of her, "*at his option*," meaning that he would have the privilege of demanding either delivery; especially when he knew that the cost of putting that fuel into the ship's bunkers would be 15 cents per barrel additional.

No more would any ordinary individual, much less would a business man, stipulate seriously for his supply of winter fuel at a flat rate of so much per ton whether delivered in his cellar or at the scales in the coalyard, "*at his option*," when he knows that it will cost him $1 per ton to haul that coal from the coalyard to his home and store it in his cellar.

And manifestly, when plaintiff asked for a contract for oil at $1 per barrel "*f. o. b. tank cars*" at New Orleans, this had no reference to any oil delivery for vessels actually lying in the port of New Orleans, as had the term "*f. o. b. vessel*" at New Orleans. And it would never have occurred to any one that it did.

It certainly did not so occur to defendants, who must know something of supplying fuel oil to steamships, for it promptly furnished one quotation of $1.15 per barrel for oil stored in the vessels' bunkers from their station at Chalmette, and another quotation of $1 per barrel for oil delivered "*f. o. b. tank cars*" at New Orleans *for shipment to Pensacola*, showing clearly how defendant understood what plaintiff meant by a delivery "*f. o. b. tank cars*," at New Orleans. And plaintiff *at no time* undertook to correct this understanding, either before or after the signing of the contract.

For the correspondence above given shows that plaintiff made no attempt at any correction *before* the contract was signed; and, when in December defendant refused to make further delivery because of the alleged breach of contract at Pensacola, plaintiff did not even then deny that the contract covered the vessel's requirements at Pensacola, but wrote as follows, through a Mr. C. A. L. (letter shows initials only), who had not handled the correspondence leading up to the contract, that having been handled by a Mr. E. C. K. (initials only given):

"We have your favor of December 26th, and also note your contract of August 23d. In regard to the letter written you September 15th (by the same writer, asking for quotations on 700 barrels oil at Pensacola for the steamer Oregon, and answered on September 17th by referring to contract of August 23d), would advise that the writer at the time did not know that the contract was consummated, and therefore had written you for a quotation. Further, we would advise that this vessel (the Oregon) was forced to go into Key West for her bunkers on trip during September, and therefore did not require any oil from you. We hope that this did not cause you any inconvenience, and trust that you will carry out our instructions embodied in letter of December 22d (calling for 750 barrels for the Oregon at New Orleans)."

From which it will be seen that the writer, with the contract before him, did not even then claim that the contract did not cover Pensacola, but only that he did not know that it had been consummated when he asked for a quotation, and that the steamer needed no oil at that port, having been obliged to bunker up elsewhere.

The above letter was of date December 29th, and was in answer to a letter by defendant, dated December 26th, refusing to supply fuel oil to the steamer Oregon, and assigning the following as its reason for such refusal:

"Under date of September 15th you wrote us advising that the steamship Oregon would arrive at Pensacola about September 25th and requesting that we quote you on approximately 700 barrels of fuel oil for this ship, delivered Pensacola. We wrote you under date of September 17th, in answer to the above letter, referring you to contract entered into, with this company covering fuel oil requirements for steamers Oregon and Hornet for a period of one year at a price of $1 per barrel f. o. b. New Orleans on any oil shipped to Pensacola, Fla. As we did not receive a reply to this

letter, we presume that you made other arrangements for bunkering this steamer and considered contract canceled.

"While we at all time want to be entirely fair with our customers, we do not believe that, after signing contract with us, on basis above referred to, that it is in order for you to request prices and if our prices as provided by contract are not in line with other prices, place your business elsewhere and expect us to deliver under this contract when prices have advanced."

So that this letter squarely charged that the bunkering of the Oregon at Pensacola by the Texas Oil Company (which had then taken place and was known to plaintiff) was a breach of the contract of August 23d, and yet plaintiff's answer, which is quoted just above, did not then claim that the contract did not cover Pensacola..

We find in the record no further correspondence between plaintiff's letter of December 29th and its next letter of February 13th, to which we will revert later on; although it was on January 27th that the Oregon took the 711 barrels of oil which had been asked for by plaintiff in December (for delivery about January 6th), and had been refused by defendant.

By letter of February 18th, plaintiff demanded about 700 barrels of oil for delivery to the Oregon about March 2d, which defendant refused by letter of February 20th, wherein plaintiff is referred to the previous correspondence.

And then followed several letters between plaintiff and defendant, the tenor of which, on the part of defendant being that the contract had been breached and referring to the previous correspondence in support of that charged, and on the part of plaintiff that it knew nothing whatever of any breach thus, "May we ask you to refer to the specific instance in which this company breached their contract with you" (February 23d); again, "Will you be kind enough to advise when and where this company breached their contract, giving us full details, as we are at a loss up here to account for your accusation" (March 15th).

So that up to March 15th no claim had been made as yet that the contract did not cover Pensacola.

### V.

On March 23d (upon telegraphic request for answer) defendant replied to plaintiff that—

"A reference to the correspondence between us sets forth clearly the manner and nature of your breach of contract, and we have nothing to add thereto."

Whereupon, on March 26th, plaintiff wrote defendant as follows:

"We have before us your contract of August 23, 1919, which unequivocally states: 'We hereby agree to furnish these steamers with their requirements * * * at a price of $1.15 per barrel.' There are no qualifying conditions or clauses.

"You stated in your letter of July 2d: 'We would not require you to accept a minimum or maximum amount, as you would have the privilege of purchasing on the open market, provided your steamers do not come to New Orleans.'

"In view of the unbecoming reticence of your correspondence with us, and our inability to make head or tail of what you are driving at, we will say that, unless you refund, within three days of the receipt of this letter, the overcharges on oil supplied the Oregon on her last visit to New Orleans, we will at once put the papers in the hands of our lawyers for suit and damages."

Here then we have for the first time the claim made that the contract did not cover Pensacola; because, stripped of unessentials, that is just what the letter means, thus (in effect):

"Your contract provides unconditionally that you shall furnish these steamers their requirements at $1.15 per barrel; and that we shall have the privilege of purchasing on the open market, provided our steamers do not come to New Orleans."

### VI.

Plaintiff's whole case is therefore built up around this clause in defendant's letter

of July 2d, to wit, "You [plaintiff] would have the privilege of purchasing on the open market, provided your steamers do not come to New Orleans"; and also on the clause in its letter of August 8th, returning the first draft of the contract, wherein said contract is referred to as "the proposed contract on fuel oil to take care of our requirements at New Orleans," and a similar clause in its letter of August 28th returning the accepted contract, wherein said contract is referred to as "contract covering fuel oil requirements at New Orleans."

The clause in the letters of August 8th and 28th may be disposed of at once. The contract clearly provided that oil intended for Pensacola should be delivered f. o. b. *at New Orleans*, so that any requirement for steamers at Pensacola was a requirement "at New Orleans"; hence the contract was in fact a contract for plaintiff's requirements "at New Orleans," whether the oil was to go into the vessel's bunkers at that port or to be sent forward to Pensacola. So that there is nothing whatever to be gained from the reference to plaintiff's requirements at New Orleans.

As to the clause in defendant's letter of July 2d: *That,* if taken literally and alone, conflicted with the terms of the final contract, which makes no provision of that sort, but on the contrary does provide that defendant shall furnish at New Orleans fuel oil for plaintiff's ships at Pensacola, and consequently that plaintiff shall take the fuel oil for its ships at Pensacola from defendant at New Orleans.

But, if this clause be not thus isolated, but taken in connection with the rest of what was said, then there is no such conflict, and the meaning becomes clear. Thus defendant's letter of July 2d was a proposition submitting a contract for a period of one year— "at $1.15 on all oil that is going to be taken by your vessels * * * at Chalmette, and on any oil shipped to Pensacola price will be $1.00

per barrel f. o. b. New Orleans; and we would not require you to accept a minimum or maximum amount, as you would have the privilege of purchasing on the open market, provided your steamers do not come to New Orleans."

It is clear from a reading of the foregoing that the clause, "as you would have the privilege," etc., was not suggested as an independent and substantive clause of the proposed contract, but simply as the *reason why* plaintiff should not be required to take a minimum amount on its contract, which latter had to be a substantive clause of the contract, because plaintiff had at the very opening of the correspondence insisted that it should be, giving also as *its reason* that its ships might have to go to other ports than New Orleans.

True, in plaintiff's first letter Pensacola was suggested as *one* of those other ports which were not to be taken care of with oil from New Orleans; but the counter proposal of defendant in its letter of July 2d was for taking care of the oil requirements of plaintiff's ships *both at New Orleans* and at Pensacola; and *that* is the proposal which ripened into the contract between the parties.

And, reading that letter of July 2d once more, we see that the minimum there spoken of had reference, not merely to oil taken into the ship's bunkers at New Orleans, but "on all oil that is going to be taken by your vessels * * * at Chalmette, and on any oil shipped to Pensacola."

It is therefore clear that the clause in the letter of July 2d should have read, "Provided your steamers do not come to New Orleans *or Pensacola.*" And its omission, evidently by inadvertence, misled no one; for, as we have said, plaintiff made no claim at any time *either before or after* the signing of the contract that Pensacola was not included in the contract as much for plaintiff as for defendant; that is, not until March 26th, which was practically *"post*

*litem motam,*" and therefore too late, even if it had been well founded.

The trial judge held that plaintiff had first breached the contract, and that defendant was thereafter no longer bound. His conclusions appear to us correct.

### Decree.

The judgment appealed from is therefore affirmed.